We'll hear Yusupov and Samazov. You were planning to do Yusupov first, is that what you were planning to do? Yes, Your Honor. Okay. And you've divided the time? Yes, we have, Your Honor. You'll tell us on that, yes. If I can, I'd like to reserve two minutes of rebuttal. Sure. Say who you are. My name is Lawrence Rudnick. I'm the counsel for Beksad Yusupov. Okay. And how much time are you going to do and how much time is Mr. Atty going to do? We're going to do 15 minutes each per the court's order. Okay. Well, I think we said you could decide among yourselves. About 15 minutes. I think I left that up to you. Thank you, Your Honor. Okay. My name is Lawrence Rudnick. I represent Beksad Yusupov. This case is back before the court to determine whether an exception to our statutory and treaty obligation not to return an individual to a country where his life or freedom would be threatened or he would be tortured, whether that exception applies. This court remanded last time for a determination of whether Mr. Yusupov is a danger to the U.S. using the reasonable... And the BIA repeated practically verbatim what it said before, except it put is instead of may be. We know the record. Yeah. And I think that's a fair characterization. They did add one fact. They added the claim that Yusupov had misled investigators when he was arrested in 2004, a fact of which there's utterly no support in the record. The board decision states that he misled the arresting officers with regard to his roommates, the roommates presumably being Samadov and Zakharov, when in fact he was living in Virginia at the time, not in Philadelphia, not residing with the roommates, and they placed some particular emphasis on that. So you're saying that he went to Virginia to evade detection, to evade being taken in, right? Well, I think the record would say he went in July 2003, before there was any concern about being arrested again, and he states in his testimony that he did it to get a job, that he lost his job in Philadelphia and he found a job in Virginia. And that IJ found him credible. Yes. Unlike the IJ who... Yes. Critical distinction. The IJ found him completely credible and further found there was no quantifiable objective or even any sensible evidence that supported the conclusion that he was a terrorist or supported terrorism. All right. You spend a lot of time on the standard of review. Most of your briefs, really, is on the standard of review. Tell us what you think is the standard of review and on what issues. In terms of... There are two aspects of standard of review. This court's standard of review and the Board of Immigration Appeals' standard of review. Focusing, I believe, Your Honor's question is about the BIA's standard of review, which is the clearly erroneous rule, which I think to quote the fifth... Clearly erroneous on what? The clearly erroneous rule is adopted by the Attorney General. It mirrors the one that this court applies every day to district court decisions. The clearly erroneous rule applies to the fact-finding made by the immigration judge. This court made clear in Kaplan that you have to bifurcate the two parts of a decision. But Kaplan is different because the issue in Kaplan is the prediction and we don't have a prediction. Which I think makes this case a fortiori from Kaplan. There's no authority and the board doesn't really claim it. They address this issue as a mixed question of fact and law and they said because it's a mixed question of fact and law, we get to make a de novo determination. Which I believe they're correct as to the application of law to facts, they get to make a de novo determination. I think this court made that clear in Kaplan and in Hoang. But they don't get to trample the fact-finding made by the immigration judge. As the dissenting board member said, you really can't reconcile finding Yusupov credible and finding that he's a danger. If you accept his explanations about the facts raised by the claims made by the government, it's literally impossible to find him a danger to the U.S. The fundamental problem with the government's theory in this case is there's no there there. They cite cases involving known terrorists, people who associate with Al-Qaeda, the Malkondi case in the Ninth Circuit. The Malkondi materially aided Al-Qaeda. This case is so different. My client is a follower of a peaceful imam named Nazarov. Now what evidence is on the record to show that he's as peaceful as you think? Well, there's two things. First, there's the testimony of Yusupov. And secondly, more importantly, there is testimony in the record. There's documents in the record, including State Department reports, that indicate that he's a peaceful minister of things in the 2000 country reports, 1999 and 2000 country reports, stating that. And then there's the Department of State's advisory opinion, which was given, which basically says that these kinds of claims of extremism are really pretextual. But it's clear that Nazarov is in no way a terrorist. There's actually no evidence in the record that he in any way supports terrorism or that any of these individuals supported terrorism. Yusupov testified at length about his beliefs and that he doesn't believe in violent change, doesn't believe in extremism of any kind. There's no evidence that Nazarov supports terrorism against any country, let alone the United States. The board seems to, they try to piece together some facts, equivocal facts, and try to turn them into, and give them weight that they're not, that they just simply don't bear. For instance, the videos. According to the BIA, the Board of Congressional Appeals, Yusupov spent approximately an hour and ten minutes viewing certain videos, which were primarily about Chechnya, which as the immigration judge pointed out, was an issue of, at the time, it was very much in the public arena. And further, that there were, it's not clear which side was the terrorist, especially at that time. There were certainly different views on Chechnya. And for Yusupov to be interested in what was going on in Chechnya hardly bears the weight of a conclusion that he then has sympathy for terrorist groups. The whole characterization of the video by the board is directly contradicted by the immigration judge, who found that Yusupov had credibly explained his interest in them, didn't find, the immigration judge didn't find the interest obsessive, and didn't find that it supported a finding that he had any propensity to violence. Is there any evidence that the IJ thought to be equivocal on the issue of terrorist tendencies? I think the IJ seriously considered terrorist issues. There was testimony by an agent from the Department of Homeland Security, and I think he fairly evaluated that testimony, and I think balanced correctly that, yes, we're very concerned about national security in this country, and we should be, but that there is no evidence that this individual shares in any propensity for terrorist acts. There's no showing that he believes in terrorism. The board concludes that there's a fair probability that he will either act or assist others in terrorism, and it's a bald finding. There's just nothing in the record that supports that finding. The finding of the IJ or the BIA? The BIA. There's just nothing. The IJ found to the contrary after he saw the witnesses, and he viewed the videos, he had a CD-ROM of the videos and looked at them carefully, and there's simply no evidence that Yusupov has any radical beliefs, let alone any propensity to act on them, and he's not associated with any individual who is an extremist or acts on extremism. The government's invoking an exception to our obligations. They should have to come up with reasonable grounds, with some probable cause that the individual believes in and will act on terrorist beliefs, and in this instance, the record's really barren of that. There's just no showing of what the conspiracy is. There's sort of this insinuation that there's these three guys who are conspiring to do something, but the facts just don't bear it out. There were Yusupov consented to searches of two computers. There was nothing found on these computers other than the Big Jihad email, which there is no evidence that Yusupov, and for that matter, Samadov, ever saw. They were ever discussed, and of course, there's some controversy and discussion about what does that really mean, and I think in context, that email can be read very differently than the way the board does, and in fact, this court thought so, and in the footnote seven of Yusupov one, instructed the board to go back and consider the relevance and weight to be given to the Big Jihad email, and as Your Honor pointed out, the board decidedly did not do that. They simply repeated what they had said previously without giving serious consideration to the court's instruction. You've given up, or you're not pressing the asylum issue? No, Your Honor. It's a time bar. It's in the footnote in Samadov's brief and the penultimate paragraph of his brief. We've conceded that the asylum claim is time-barred, but... Then what do you want us to do? I guess under the normal remand rule, I'm asking the court to remand the case to the board with instructions to either remand for further fact-finding to the IJ, to show due deference or show due deference to the instructions of the court, and the Kaplan and Huang decisions on the limitations of their ability to make a de novo determinations, de novo reversals of fact-finding. Are you specifically asking us to do the following? I presume that your point is on credibility determinations, there should be appropriate deference, and that appropriate deference is that credibility determinations by the BIA should be true, unless when applying a clearly erroneous standard, the BIA says these credibility determinations are troublesome, they're troublesome to such an extent that we find them to be clearly erroneous. Is that right? That's correct, Your Honor. Under the normal remand rule, the Supreme Court's reiterated a number of times, I would love for the court to simply reverse the board and instruct that my client is entitled to withholding under both the statute and the statute of limitations. Can we do that? I thought you might say that. Are we really in a position to tell the board to withhold removal? It would be an extraordinary circumstance. I mean, I think the Ninth Circuit did in one case. Ventura. Ventura. That's the only one we could find. Yeah. But isn't that clearly an agency determination, rather than a court determination? Your Honor is correct, I mean, the normal rule is this court remands to the board with instructions how to properly and correctly apply the law. Because they have to do the withholding removal. Right, and they have to make the adjudication. You can't do that. I think it's questionable whether we can do that. Yeah, there's an exception in the Supreme Court decision where something is extremely clear and extraordinary. But the normal rule is this court remands with instructions. If we found it to be extremely clear in your nomenclature you just used, we would, in that circumstance, we would order them to order removal? We have to order a withholding removal. A withholding removal. Yes, thank you. Oh, I just didn't remember. Right, right. You wanted to order removal?   I'm sorry, Your Honor. I said one of the single states' opinions. It would be one of those little single state orders from the Supreme Court telling us we have not kept to what is our role. Right. That's really too much. Go ahead, Mr. Murthy. Okay, in terms of the evidence considered by the board, and again, the characterizations of it are extraordinary. I mean, on one hand, we have the extradition and Interpol warrants from Uzbekistan, a country with notorious human rights practices. On the one hand, that is given, I mean, the board upheld the deferral of removal on the basis that it would be torture. Well, we'll have to ask the government about that. It seems to be an inconsistency. It seems utterly incompatible. I think by time's up. Well, Mr. Zinsser heard me, so he'll be prepared. I think by time's up. Mr. Rafferty, thank you. Thank you, Your Honor. Thank you. You want rebuttal? Mr. Rafferty, you want rebuttal? I would like rebuttal, Your Honor. I guess they're entitled to those two cases. Okay. Good morning. May I please support Vahar Azmi on behalf of Petitioner Samadal? Now, Mr. Azmi, Mr. Rodnick concentrated on the fact that the IJ found Mr. Yusupov credible. You are not in that position because your IJ found Mr. Samadal incredible, even though the first time he found him credible. That's right, Your Honor. Okay. So let's hear from you on that problem. Yeah. Your Honor, we don't agree with the credibility determination. We think it's unreasonable. And further, we think even if you were to agree with the credibility determination, you should still reverse because, and first I should stress, there is actually no evidence of inconsistency in his testimony. I want to be sure that you're on the safe side. The IJ simply found implausible his consistent testimony that he failed to remember giving money to his brother five years earlier. So first, there was actually no inconsistency. No, there was an inconsistency. The first time he found him credible and the second time he didn't find him credible. And that, to me, is inconsistent. Yes, Your Honor. It seems to me that the IJ in the second hearing... I was talking about inconsistency. No inconsistency in the testimony. That's right. That's right, Your Honor, Judge Stable. No inconsistency in the testimony. She simply found it implausible, his consistent testimony, that he failed to remember giving money to his brother. And we should stress that even if you were to credit that implausibility finding, that is not affirmative evidence of dangerousness in any way. And this Court's precedent has made clear that any credibility determination needs to go to the heart of the claim. And so this is very much unlike the Malkandi case, again, which the government cites, where that credibility determination was based on detailed findings in the record, first of all, but also went to the core of his defense that his conduct was innocent. Here this plausibility determination is immaterial to the central issue in this case, whether or not he's a threat to national security. That's because this case arose before the statute that's currently... That's right. It's a pre-real ID statute. So one has to ensure that the credibility determination goes to the heart of the claim and one cannot take one credibility determination and take it across to find other testimony not credible. And then even as we detail in our brief, we think the credibility determination was unreasonable. It's clear from the record that he was confused. He's being asked initially about money he's given to Imam Nazarov and charity. And he answers that set of questions. Thirteen pages later, after a number of topic changes, the government comes back and asks another question about wiring money to anyone else. And he said, no, he's still thinking about charitable donations. Then he very quickly says, if I gave money to anyone, it would have been to my brother. I don't remember. It would have been to my brother. Later, he attempts to clarify his testimony. The IJ cuts him off. And then in the intervening period between this hearing and the next hearing, he affirmatively attempts to clarify his own testimony by calling his brother and brings to the hearing proof that he in fact gave money to his brother via a wire transfer. And contrary to the government's characterization that he was confronted with this evidence, he himself took it upon himself to find the evidence and brought it to the hearing before he knew the government was going to confront him with it. He was as candid as he can be. There's documentary evidence in the record about the payments going to the brother? Yes, Your Honor. There is a wire transfer. I guess he brought some documents to show it was a loan, a repayment of a loan. But those are not in the record, right? I believe there's evidence in the record demonstrating a wire transfer to his brother's account in Tashkent in Uzbekistan. With respect to the explanation that it was a repayment of a debt. The evidence for that is Mr. Samenov's own testimony. I think there would be no other documentary evidence to prove that because the initial loan was given in Tashkent. There's no evidence in the record that the brother is in any way associated with any kind of terrorist organization? That's very important, Your Honor. Absolutely not. The only evidence in the record is his brother is a non-practicing independent Muslim and a businessman, a building contractor. And the BIA characterizes this repayment of a debt as some sort of nefarious sending money to Central Asia to sort of raise the specter of some sinister connection. But ultimately, it's a traditional repayment of a loan that's consistent with what immigrants do all the time. What are the BIA's pure errors of law? There are several, Your Honor. First, they failed to identify how Mr. Samenov is a danger as opposed to merely maybe a danger. And as a part of that, they failed to identify how he's a danger to this country. The BIA, to the extent we can ascertain what their theory of dangerousness is, it seems to be that he supported Muslim extremists in Uzbekistan. But the statute and the case law, particularly Chima, are very clear that you have to establish a nexus between supporting so-called extremists, which we would not concede is in fact the case in light of the corruption of the extradition warrant. You would have to show a nexus between that extremism and harm to the United States. The refugee protocol anticipates people are seeking refugee status from a country that presumes them dangerous. And so without evidence that the individual is harmful to the United States, we would be turning the refugee convention on its head. So that is one error of law. Another error of law is that it failed to identify any individualized probable cause, any particularized suspicion to Mr. Samenov himself. You want to say that again? They failed to – this court said that the reasonable grounds is akin to a probable cause standard. And probable cause requires that the suspicion be particularized to an individual as opposed to merely associational. And setting aside the fundamentally corrupt Uzbek extradition request, all of the evidence in this case relates to persons other than Mr. Samenov. And there's a clear line of authority, including a case cited by the government, Burton, which says that mere propinquity is not enough. Simply, in the Burton case cited by the government, simply knowing notorious drug dealers does not establish probable cause as to the individual for suspicion of drug crimes. And there's a series of child pornography cases involving computer crimes, including a Judge Sotomayor opinion, and it's also cited approvingly by this court in Dennington a couple of months ago, which requires evidence that – It's not surprising that we would cite approvingly the decision of the Supreme Court. It is – well, sorry, it's a Second Circuit – then-Judge Sotomayor. All right. Yes. So – and then the final error is the absence of substantial evidence to support a number of the inference. Is that an error of law? I mean, underlying everything that I see, the issue is whether there's substantial evidence to support the BIA's determination, which is our usual standard of review and evidence. Your Honor, I should clarify. I mean, I think the question of whether the evidence taken together and perhaps even assumed to be true rises to the level of either probable cause or there is a danger of determination is a mixed question subject to de novo review. Factual findings by the BIA and the IJ are subject to the substantial evidence standard. Factual findings and inferences about those findings. So, for example, the BIA's presumption that it was Becky Warrant makes our client dangerous. That would need to be supported by substantial evidence, and our position is from the briefs it clearly is not. So there – so you would evaluate the accuracy of the findings under substantial evidence, but whether or not that evidence rises to a substantive legal standard is a mixed question subject to de novo review. How can we review an IJ's finding that Mr. Sanada was incredible when the IJ saw him, said he was belligerent, and a lot of the IJ's findings depended on his demeanor? Your Honor, actually the demeanor finding was simply not supported by any actual findings on the record. She simply – But how can we know that? Because in – this court has required, in Dia and among other cases – In one of Judge McKee's – Judge McKee's opinion that we cited, it actually says demeanor findings and evasiveness findings are potentially more prejudicial than any other kind of findings. So it's very important that the IJ identify why she believed he was evasive or not credible. And again, in Malkondi the court emphasizes the evasiveness finding was detailed by substantial examples by the IJ in that case. Here she simply finds him to have had poor demeanor and to have been – and the belligerency I think reveals a sort of uncomfortable predisposition against the client. He was merely trying to get his lawyer's attention and she – and the government characterized that as belligerent. I think that's not a fair reading of the record. And I think it's – the IJ needs to substantiate these kinds of credibility findings. Oh, Your Honor, on the – on what to do with this case. I part – accompany somewhat from Mr. Rudnick. I think it is appropriate in this case to remand with instructions to grant withholding. There are a line of cases that I wouldn't characterize as exceptional exceptions to Ventura. When one – when the – when remand for further development would be futile. And futile is defined as where you would expect the same result to occur on remand. And to the extent that factual development is concluded in this case, that the BIA has twice rendered an identical decision despite this court's instructions to change the standard of review, I think leads – should lead this court to a prediction that they're going to issue the exact same decision. There's a case also by Judge McKee from this year, Kang v. Attorney General, 611 F. 3rd 157. Where there's a remand with instructions to grant withholding. And I think the best evidence that you can expect the same result is how much of the contrary evidence the BIA ignored in this case. To take one prominent example, they continue to believe that the Interpol notice – and Mr. – is reliable, and Mr. Samuroff might have been responsible for the Tashkent bombings in 2004. Despite unrebutted testimony, Mr. Samuroff was detained in custody in York County Prison. How can – how can the BIA come to that kind of a conclusion in light of obvious facts to the contrary? Is that your best example on that point? No, our best example is that the BIA would implicitly credit the extradition notice, which the overwhelming record evidence that they do not take into account demonstrates that its manufactured pretextualness really has no basis in reality. Thank you, Mr. Abner. We'll get you on rebuttal. Good morning. Good morning. May it please the Court. I'm Lyle Jenser for the government today. Because Yusupov and Samuroff have both been granted cat relief in this case, they've both been granted deferral of removal, and as you might remember in the previous argument, the government has stated they will not be removed to Uzbekistan as long as this government is in place. Yeah, but what is the process by which you can change a cat's ruling? Do you have to have a hearing before you can do that? There has to be a hearing before the IJ – excuse me, the immigration judge, Your Honor. Well, we know what the IJ is. And there will be full due process at that hearing. There is virtually nothing that can be granted in withholding on the cat or even withholding a removal under the statute that you didn't get under deferral. It may be a little bit easier under deferral to reopen it, but in all three cases, the individual cannot be sent back to the country where he is to be persecuted or tortured. Okay, let's get down to the facts. You want to move that microphone over so we can hear, make sure we hear you. Was me wrong? Yeah, not me. You were telling me. Thanks. Isn't there an inconsistency between the government's position that they will be The reason is a very poor civil rights record with respect to Uzbekistan, and yet the BIA is reliant on the Interpol request and the request for extradition based on requests by that very same Uzbekistan government. How can you do one and the other at the same time? We don't believe there's an inconsistency, Your Honor. The statute specifically provides Congress is given the Attorney General the authority. He is the one who is empowered to determine if somebody is a danger to this country. Whatever inconsistency there might have been was resolved by the fact that, I take it I'm not talking loud enough again, Your Honor, was resolved by the fact that we're not sending this person back, but everything has to be looked in the full context of what was before the IJs and the Board of Immigration Appeals. That's what reasonable cause is. Of course, this Court has already held that reasonable belief is akin to probable cause. It's a balancing of the factors. In this case, the Board looked at all the factors. Now, the factors that we have are we have an extradition request, we have the Interpol warrant saying these three individuals committed violent acts. Now, those are the, as I look at it, we can go through all eight or seven, but those to me are the two principal ones, right? The two principal factors, Your Honor? That support the finding that they are a danger. In context, Your Honor, with what was found on the computer, with the evasiveness of all three. We'll get into all that also. Yeah. But, and you don't see it, an inconsistency between relying on that very government, where there's also a finding, I think by the IJ, but no, maybe another agency of the government, that Uzbekistan uses the request for extradition to get at its political enemies. That's the IJ. Was that the IJ? Actually, what the evidence showed was that Uzbekistan gins up charges to get at people, but basically those are people who are in the country. You have to remember, these three individuals... It's an extradition request for people who are in the country. Precisely, Your Honor. But they use the extradition request as a basis, the BIA did, as a basis for its finding that they are a danger. I guess we're talking two separate things. Well, I don't know. Uzbekistan... Maybe they are inconsistent. Uzbekistan, what the State Department said, gins up charges for political dissidents, for religious dissidents. There's no dispute about that. What's interesting here is these people were not in Uzbekistan, and yet for some reason, Uzbekistan wanted them back. Because, apparently, because they're not friendly to the current government of Uzbekistan. They're already out of Uzbekistan. They can't harm them unless... Unless we give them, those people back. No, if we give them back, Your Honor, of course they'd be put in jail. I mean, even the government would... And tortured. Even the government would admit that. The BIA is so found. The point is, Uzbekistan, these people are in the States. The only reason, or the only way they can harm Uzbekistan is if they're sending back money to finance violent acts. What evidence is there on the record that the only one you say sent money back was Hamidash who sent $200 to some people, families of people who were in prison, I think, and then the $3,000 to his brother. Is that the evidence from which you rely? Yusupov also said he sent money back, although we don't have how much. It wasn't that much. Don't you have to prove your case? For... It's your case to provide the evidence. This is not criminal. This is national security. As the Supreme Court recently said... And you don't have to prove a danger to national security? We have to prove a non-trivial risk to national security by looking at all the evidence. The Attorney General has to assess everything, Your Honor. And he's got to make a reasoned decision based on everything. The fact is, and they're separate, Yusupov and Samudov. I guess let's go with Samudov. I'm going to interrupt you for a second because I want you to answer the judge's question, which is, is there any evidence in the record with regard to the money being sent to the brother or the family members from which we can deduce that they were sent either in aid of terrorism to terrorists or from which we can deduce that there was a terrorist source here? That was the question. And I understand the totality of the circumstances analysis you're about to go to, but I'd like an answer before you go to that. The major evidence of that would be that for whatever reason, Samudov categorically lied about the $3,000 he sent back. He lied about the $3,000? Oh, he lied. When you look at the record... Is that you speaking or is that some voice coming down? No. He lied. That is what the immigration judge found. Yeah, but on what basis could the immigration judge say he lied when there is evidence from the brother that he owed me $3,000 to finance his education in this country to get here? You have to look at all the factors, but when you go through the questions very carefully that were asked of Samudov, he was not asked, did you send back the charitable causes? He was asked, did you send money back? He immediately turned it around in his first answer to charitable causes. Then as the government counsel starts to focus in, any other money? No, no other money. I don't remember. Now again, because we've heard here that he tried to correct himself. It's kind of hard to correct yourself when you say, I don't remember, I don't know, and then say, oh, I do remember. That's a big difference, plus the fact that the... Are you suggesting that when someone reforms themselves and comes up with a specific instance? This happens every day in every courtroom in America where someone forgets they're either confronted, it's the adversary, or maybe their lawyer comes up with a document to refresh their recollection. Or they call their brother. And we're supposed to intuit that there's something nefarious. What I am doing most respectfully, Your Honor, is asking that you go back over the record, the pages that are cited in my brief, and you will see that although that is what Samudov's counsel is claiming, that is not what happened here. Okay, what pages? I have the entire record. I'd have to... I had my law clerks bring it up, so... Possibly at the end, I can write them down for you so we can go on. Okay. I know it was 438, but there's a whole bunch. In the brief, twice we go on the facts and then in the findings. Do you contest Samudov's counsel's point that it was he that came forward with the evidence of the Western Union receipt with regard to the $3,000 to his brother? We categorically do, Your Honor. Before he got to that, the trial counsel had brought the wiring. All the evidence was there in the first hearing, Your Honor. All the evidence was there and he was confronted with it? Yes. By the government? Yes. If you take a look at the hearing, on the opening, there were two hearings on the opening. The first was where Oleksii testifies, and that's where he's questioned to start with. And by he, I meant Samudov. And the trial counsel focuses in very strongly on, are you sure that's all you did? Yes, yes, yes. Okay, fine. We would like a continuance. They come back on continuance in a couple weeks. Trial counsel produces the bank records. Samudov then takes a stance and says, well, I called my brother and here's stuff that says it was to my brother. Again, he only did that because he was caught. That's a far cry. Or he did that because he recollected it. How are we to intuit? Well, the thing is, Your Honor, technically it's not whether this court can intuit because the standard review is substantial evidence. He's got to show the record compels a contrary conclusion to that which was reached by the immigration judge who was there at both hearings, who listened to the evidence, who watched, who she found, that he had lied. Well, perfect point for a segue to credibility determinations. So you just suggested that applying the correct standard of review, we should, the BIA should defer to the IJ's credibility determination on this particular point. Now let's talk about Mr. Yusupov for a moment. Isn't it correct then when analyzing the standard of review that there's no dispute that with regard to questions of fact, BIA's review should be clearly erroneous. My question is the question raised in the papers and that is with regard to credibility determinations. Now, it's very easy to say the BIA gave due deference and applied a clearly erroneous standard, but doesn't applying a clearly erroneous standard require that the credibility determinations of the IJ be deemed to be true and then you go to the next step from there? It seems to me that at least, I understand that Yusupov and Saminov are in different positions with regard to the IJ determinations. So I'm just talking about Yusupov for the moment. When Yusupov's or the IJ on the Yusupov case came to the credibility determinations they determined that those credibility determinations made by the IJ are true and then go from there in its analysis? We would agree with that, Your Honor. Yes. Okay. Well, how about you rely heavily on Interpol notice and the extradition request, et cetera, whereas the IJ credited the testimony of Mr. Yusupov that he had never engaged in any violence or illegal activity while he was in Uzbekistan. Now, how can you, if you're bound by a credibility determination that that testimony is true, how can you rely on the documents from Uzbekistan to find that he's a danger? Well, what we do is we consider it as one factor in the context of all the other factors and that would include not just the videos of the terrorists that Yusupov took. And by the way, because I forget, I do wish to point this out. Mr. Saminov says he never reviewed those videos. This one I do have the page cycle right off. At page 209 through 210, Yusupov testified that Saminov and Zakharov both reviewed those videos, which that goes to his credibility as well. But what we're saying, Your Honor, we had these... Excuse me. It is, of course, the extradition request and the Interpol warrant that starts off the That's in June of 2002 and they seize the computer. It takes them two years to go through the computer to find out a limited amount because a lot of the files are encrypted. They find this stuff. They put that together with the fact that Uzbekistan says, these guys are terrorists and, agreed, Uzbekistan tends to gin up charges. The Interpol warrant, which we have, it's a red warrant. The highest degree says that they're charged with financing terrorism. Yeah. We then look and see, we find these violent videos on the TAPE Plus and these are not videos that could be found normally. I mean, these are videos not... But let me stop you a minute. All of those things were before the BIA. And the IJ. But all of those things were also before the IJ and they all went into the IJ's determination when he said, do I believe this man when he sits here and he details his life, peaceful life, and his devotion for the imam who is completely nonviolent. That is correct. He made a factual determination that the testimony was true and the Attorney General's regulations say that the BIA is bound by all factual determinations, quote, including credibility determinations, unless they're clearly erroneous. Now, my question to you is how you can accept, as you're bound to do, I think, the credibility finding that Mr. Yusufov was telling the truth and still say, well, these things are not just persecutions as we happen to find them to be persecutions when we were deciding another issue. But how can you say that they tend to show that he was engaged in violent activity or some other subversive terrorist activity? We say they are one factor. The board has – it's not a matter of whether they credit the testimony because they did. They said it's not clearly erroneous. We go. But reasonable cause, reasonable belief is a different creature. That's the weighing. That is, the IJ finds four or five things and says, not enough. The board goes by and says, well, we consider all of it, and that would also include the map that was found. All right. Let me get back to that same point. Let me get to the terrorism point. There is a specific provision in the Criminal Code, 18 U.S.C. Section 2339B, which prohibits providing material support or resources to certain foreign organizations that engage in terrorist activity. Has there been any charge brought against either Mr. Samudov or Yusufov under that provision? No. Well, but that provision is precisely the provision that would be applicable if the Attorney General really believed that these two people were providing material support to terrorist activity. I agree with that as far as it goes, but that's not the statute that governs. What governs is 1231B3B4, and that states – that gives two possibilities, and one is the Attorney General has a reasonable belief that the person poses a non-trivial danger to national security. Yeah, but if you thought that they were providing, by spending this money, material support for a terrorist organization, wouldn't you have thought that I would have thought and would have hoped that the Attorney General would have used the charge that's precisely for them? But we would say that 1231B4B4B3B4 – thank you for correcting me, Your Honor. That is the precise charge. They didn't bring criminal charges, and we understand that, but that's a different version of proof. Well, but if you had evidence or a reason to believe that that's what they were doing, why would the Attorney General not have put that charge? Maybe because – well, I don't know all the factors that the Attorney General considers. That's a decision that's on him. The big thing, though, Your Honor, is that he is charged with protecting this country. That authority goes to him, and the actual burden is a non-trivial risk to the national security. That's much different, Your Honor, than the – Is there any evidence that they were in contact with a terrorist organization? No. No such – No, no. Is there any evidence, either in Uzbekistan or here, right? There's no such evidence? There's no evidence that I'm aware of, Your Honor, no. So why do you charge them with being a danger to this country? And not to Uzbekistan, but to this country? Well, again, because of the videos that were found, because of the lying – Okay, wait a minute. What about the videos? I have a question about that. If in 1939, if there were computers, if I or somebody in my family had wanted to hear what Hitler was saying in Germany, and you got videos which were presumably, if we were today, would be on video, if they were watching what Hitler was saying, would that make them pro-Nazi? Not necessarily. Okay. Well, then why was watching videos that were online – Chattanooga. Yeah, Chattanooga. Why would that make them – why would that support the finding that they're a danger to this country? And that's precisely the point. It doesn't prove it supports the – Why? Why does it support it? Well, let's take a look also at the rest of the evidence, which everything has to be looked in context, to include a map of all the police stations in Pennsylvania. No explanation for that. Well, the explanation – and first of all, that wasn't Samadoff, was it? Well, Samadoff looked at these videos, and he lied about it. Well, Samadoff said he didn't look at those. We don't know what he saw. How can you say he lied about it? Because first of all, I looked at the page you told us to look at, 209 and 210 of the  In Yusupov. Pardon? Oh, in the Yusupov? Okay. Go ahead. I have a hard feeling about it. Good. No, go ahead. You come back and talk. You answer. Yusupov categorically stated that Samadoff and Zakharov watched the videos with him. That's in his testimony. Again, it's the Yusupov record, and I apologize for the confusion. No, I'm looking at Yusupov. Go ahead. Now, when you put that together with this Jihad thing, and again – What Jihad thing? The email. And again, this court said, we don't know what it means. Did that go to Samadoff? Who did that email go to? It went to Zakharov, who came over with Samadoff, left school at the exact same time, apparently under very strange circumstances, and what that means – Who has been granted withholding. The only person to whom that was addressed, as far as we know who read it, has been granted withholding. Again, Your Honor, and as I cited in my brief, and I have the records from Zakharov here, Zakharov was able to get out before the new evidence was found. The government did move to reopen. Zakharov fled to Canada, and the government said, there's no chance he's coming back. So they moved – they just said, we'll withdraw. And I have that with me in my file right here, Your Honor, if you'd look to see. So that's kind of a non-starter. But the point is, how is it a non-starter when the email was to him – you know, you read this email, what does it mean in this context? You know, struggle, warfare. I mean, it has – the word itself has many different meanings, iterations. How are we to determine really what it means or what reasonable inference can be drawn from it? Well, there are two things. First of all, the BIA, in its opinion, specifically cited documents that Samadov had submitted that define big jihad as violent struggle. But I'd also ask you, if you read it again, what becomes very clear from that – Aren't there other references or instances where there are in the record different meanings, inferences that are drawn from that reference? Well, there could be. There could be. But the BIA found them. This court, in its first decision, asked the BIA to look into that. They found the exact page, the exact reference, and they found that supports us. And that – the record does not compel a contrary conclusion. But the next thing to look at, when you read that email, Zakharov is not working for himself. Someone else is in control. They're telling him, you can't come back. We need you to stay there. Now, again, because everything has to be looked at in context, remember, Zakharov and Samadov come over at the exact same time, purportedly to attend an English school. They go for two weeks. Then they go underground. And we never hear from them again. They just disappear. Samadov's reason for that – I'm not sure I understand. What's the evidence that they went, quote, underground? Their own testimony. They disappeared. They did not go to their embassy. And both said – at least Samadov says he had nothing to fear at the time. They did not – he did not contact his brother. And there's a letter from his brother which says he never contacted them. Samadov claims, I had to drop out of school because my brother went bankrupt. Samadov comes here in February. He goes to school in March. The brother claims he doesn't have financial difficulties until 2000, a year later. Somehow, there's a disconnect there which is never explained. That ties in with Zakharov, too, because they come together. Samadov's explanation, why have I quit school? I had to. There was no money. Then why did Zakharov, who came at the exact same time, do the exact same thing? Did you ask Zakharov? I mean, you say, why did Zakharov? But you never testified. Zakharov never testified. Zakharov had fled the country at the time. We couldn't ask him because – He left the country. He was in Canada at the time and we could not get to him. Okay, let's go back to your 209 that they will – how – 210, Your Honor. Yeah, well, all right. I'm going to get to 210. It comes after 209. When you – this is use of policy. When you review these videos, was it by yourself or your roommates there? Were you part of some group effort or what? Answer. I believe that after the events of 9-11 and the whole world, the entire world is interested in watching and listening to what he says about Indecentible. And likewise, we also are watching or viewing or listening. Well, that's what I'm asking. Was it you watching this by yourself or were you watching with other people? There was other people. Who was it? Zakharov and Samazov. Was this regularly scheduled? Well, it wasn't planned. The entire world was watching and listening. I'm not sure that the fact that he put Zakharov and Samazov in the entire world is an affirmative testimony that he recalls that they were watching these. And why were you watching it? Everybody was watching it because everybody was interested and it was happening. And that's about all he writes. That's a pretty slim read to rely on. Your Honor, in fairness and with due respect, I don't believe that's a fair reading. What do you mean a fair reading? No, your conclusion. Who read it? Who watched Samazov and Zakharov? And the whole world. Samazov and Zakharov are in the whole world. But he was asked specifically, he said, my roommate Samazov and Zakharov. I must stand by that, that they watched it. And Samazov categorically states he did not. Now, let's pull back. Go back to the credibility of Samazov. Yes, Your Honor. I think the IJ said, well, he didn't provide the names of the occupants of his house. Right? Can the government point to anywhere in the records where Samazov was directly asked to provide the names of the occupants of his house? I can't find that. Can you point to somewhere in the records? Your Honor, as Counsel for Samazov very sagely pointed out, I did not defend that in my brief. I cannot point that out. I can't. I believe that's a peculiar finding, Your Honor. Okay. Can the government point to anywhere in the records where the IJ says that Samazov was acting belligerently or being uncooperative, other than the instances where he was trying to clarify the line of questioning or when he gestured to his wife? The very last thing that the IJ did when Samazov was signaling to his wife, and that's clear from the records, and the IJ had had it and said, stop it. And you will not do that. She directed his counsel to talk to him about it, and the counsel apologized. Because he was gesturing to his wife? And counsel admitted that Samazov was wrong in doing that, that he had told him not to do that sort of stuff. The IJ has to be able to control her courtroom. That's what she was doing. What's suspicious about gesturing to your spouse? Well, no. I'm not saying it was suspicious. You asked me if it was belligerent, if it was non-cooperative. Yeah. The normal witness does not do that. The normal witness understands. And Samazov had been on the stand several times. I'll ask my colleagues who were trial judges, I never was, whether a normal witness made gestures to a spouse. When he's on the stand, Your Honor, when he's being questioned? Well, I don't know. I'll let them comment on that. Is there, on this subject, the IJ seems to have been most impressed by what she regarded as a material omission in testifying about funds sent to the brother. Is there any, has anybody suggested a motivation why he, I mean, the IJ drew the inference that he must be hiding something. But if there's no reason, there's no evidence to believe that the brother is involved in any kind of nefarious activity of any kind, what is there, is that a reasonable inference to draw that he's hiding something? In the absence of any evidence as to reason to believe the funds were going to support something. We believe there is. Before I answer that, I just wish to inform the court that the red light's on, so I understand. That doesn't stop us. No, no, no, I understand. That's wanting to make sure. And we control that. In the Ninth Circuit. Well, we're not in the Ninth Circuit, not in the Supreme Court. We're the third. I appreciate that, Your Honor. The question then becomes, first of all, in light of these warrants and the extradition which says he's sending money, and in light of the directness of the question, why did he lie about this? Now, remember, the Attorney General, he, this is not a criminal case, proof beyond a probable cause. This is protection of the country. You have to put, you being the Attorney General, has to put the pieces together, and has to look at all the stuff, and he has to wonder, as the I.J. did, why?  The I.J. Yeah, the I.J. You want us to come to the conclusion that he lied, and you tell us that on the date that the hearing was adjourned to, the government had come with evidence that day, but it's also clear from what you've said and what counsel said that Samadop came with evidence that day. So, obviously, both parties came to the hearing that day with the intent to disclose to the other side that there was evidence that this happened. So, if that's so, then why are we to infer, conclude, whatever verb you want to use, that he was lying? Why? Well, because the first time around, this was the biggest amount of money he had sent your Honor, and he was asked, did you ever wire any money? This is the first hearing, just to be clear. He was asked very specific questions, no, no, no. Then, he starts backing off, well, I don't remember, I don't know, but he never admits that he sent $3,000. It's clear from the questioning that the, I'm sorry, the trial counsel had something. That was very obvious, and it was clear that Samadop understood that. Well, remind me, because I don't remember. In the first hearing, was there a reference to $3,000? There was just a reference to money, as I recall. The first hearing on reopening. So, if he believed... No, he doesn't mean on reopening. I think he means, you mean the first hearing. Yeah, that's what I said. Yeah, well, he said on reopening. He added to you. I don't think there was anything on the first hearing about money whatsoever. It didn't come up until the second hearing. The two instances that we're talking about, when you say he was confronted, and then when you say both the government and he came with evidence of $3,000, okay? Not that one. The first time money, he was questioned on money. My question to you is, did the government specifically question him on $3,000 at that time? I presume the answer is no. That is correct. Okay. So, from that hearing, you want us to conclude that he knew he must have got caught. He got caught in a lie, and that that's why he came with this evidence the next time the hearing was adjourned to. The government had evidence at that point of the $3,000, and he came forward with evidence of the $3,000. And we're to infer that he was lying the first time, when he was originally... With due respect, I believe your Honor's confused as to the record. I'm not confused as to the record. I'm only repeating what you've said. If I may, your Honor. The first hearing, he's granted withholding of removal. Subsequent to that, JTTF seizes the computer. Everything's reopened again. Another hearing comes up. Special Agent Oleksii testifies. In response to Special Agent Oleksii, and this is on reopening, Samadov testifies. Samadov at that time is asked, did you send any money? That's when all this questioning comes up. Then there's a continuance, and my question to you was, at that hearing, was he asked about $3,000? And I'm asking you that now, and I presume the answer's no. That's correct. On reopening, no. That's the answer? I wasn't confused. Thank you. Three hearings. I have a question. Yes, your Honor. If the two men are dangerous to Uzbekistan, and obviously the government of Uzbekistan thinks they are a danger, they want them back, does it follow that they are a danger to the United States, which of course is what the statutes provide? I think what the board was getting at, your Honor, was that based on their connections that the Uzbekis were charging with terrorism, along with the videos that were found on the state barracks, and along with the jihad letter, that the board's conclusion was they were a danger to this country. But I would also note that national security is defined to include our foreign affairs interests, and we have a treaty with Uzbekistan. I don't think, though, that's where the board was going. You mean if somebody who is in this country is doing things that a country that we have labeled as, well, terrorists, really, if you look at all the labels, that that's a danger to this country? You know, that's what the Nazis would have said in the 30s, but I'm having difficulty putting it in the context of today. Again, we believe what the board was getting at is the danger to this country because of all the evidence. But, as the statute reads, national security is defined that way. I don't think that's the way the board... I don't think that was the gist of the board's decision, though. So you think the gist of the board's decision was what? Was a danger to this country, based on... Based on the fact that they were opposed to the Uzbekistan government? Based on that, plus the dangerous videos, the fact that the videos were found not on one computer, but on the second computer that Yusupov used, based on the fact that Yusupov repeatedly evaded the immigration authorities to include when he was put out on bond. And when he had an asylum hearing scheduled, he just left for Virginia without telling anyone and he couldn't be found. And that when Samadov and Zakharov, after this stuff was seized, were put back into proceedings, Yusupov quit his job, said he could not be found, and he states that on the record. So it's based on all of that. Let me put it this way, and maybe this is a good way to wind this up since we can't stay all night. What evidence is there that either of these men either engaged in at some point or planned to engage in at some point any conduct against the interest of the United States or that they were associated in any way with an organization that has conducted conduct or planned to conduct conduct that is against the interest of the United States? There is no direct evidence. That's probably the answer that you're looking for. There's no direct evidence. But I would state, again, and maybe this is... No direct, you say no direct evidence, but what does the circumstantial evidence lead one to conclude was conduct or plans or association with a group that had conduct or plans as opposed to watching TV? I guess what the question is, we don't have to show a smoking gun. As the Supreme Court had stated, the government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before the court should grant weight to its empirical conclusions. Is your answer to Judge Staple's question none? Is the answer to my question none? No, we have the evidence that we've already talked about. Now, nothing beyond that. What were the acts or plans or intent? Does all this circumstantial evidence lead you to conclude they had? We don't know that, but we don't have to show that, not under the test. Oh, okay. Thank you. I understand your position. Thank you. Thank you, Your Honor. I'll answer Judge Staple's question. It's a mathematical formula. Zero plus zero plus zero still amounts to zero. None of the evidence taken together separately, however you want to consider it, amounts to anything. There really is no evidence that these gentlemen ever engaged in or intended to engage in any terrorist activities, let alone a fair probability. Well, his question wasn't limited to terrorist activities. It was conduct against the interests of the United States. I think that's the way he framed it. I mean, there's no evidence of any conduct against the United States of any kind. And Your Honor had asked me about Nazaroff. Well, the State Department itself had opined – it's on page 20 of our brief – we cite the 1999 Human Rights Practices that he's a peaceful imam. There's no question about Nazaroff. He's not a terrorist. Who are they associated with that's performing terrorist acts? And the answer is no one. Where is Nazaroff now? Your Honor, it's outside the record. As far as I understand, he's in Sweden under protection of the United Nations. But the issue – the government began by making what I thought was a peculiar argument that, well, it really doesn't matter because these gentlemen have deferral. Well, it matters a great deal to my client. First of all, he has significantly less rights under deferral than he would under withholding. And also, there's a ground of inadmissibility. What rights does he not have? Well, first of all, there's a very low threshold to reopen a deferral. And even more importantly – and this is factually based in the record of the habeas proceeding. I represented Yusupov in the habeas proceeding. The government alleged that they were going to get diplomatic assurances from the government of Uzbekistan. That is an extrajudicial, extraregulatory agency procedure provided by regulation that would allow Yusupov to be removed from the United States without a hearing of any kind. Subsequently, in the habeas proceeding, the State Department advised that they would not at this time seek a diplomatic assurance so that Yusupov could be removed. I mean, he could be – if they're diplomatic assurances granted, he can be put on a plane and taken to Uzbekistan. If the United – I thought – I asked that question, and I thought the answer was he would have a hearing. The answer is not correct, Your Honor. He would have a hearing if there was a movement to reopen. It's in the regulations. It's really not a matter of fair dispute. If the question is – if the government can move to reopen deferral proceedings before an IJ, but they do not have to. They can use this other extrajudicial, extraregulatory power to remove someone. Is that in the regs somewhere? Yes, it is in the regulations. I didn't know that. It's in – I think it's in 20 – it would be 208, I think 17 or maybe 18. Can you write – can you write and instead don't re-argue the case? No, absolutely. No, no, no. Just write and provide that – because it's important. I'd be happy to, Your Honor. That regulation. Yeah, just a straightforward, short letter pointing out where in the regulations. Yeah, send it to the clerk of the court. Yes, we can certainly do that, Your Honor. But lastly, I'm struck by – and I'm somewhat sympathetic to counsel, who's sort of between a rock and a hard place here, but the ode to the deference due to an immigration judge in the Samadov case apparently is unique, because when it comes to Yusupov, no deference apparently should be given to the findings of the immigration judge. I don't think the government can have it both ways. Thank you. Thank you. I know you've prepared what you want to say, but the question I have is, is Kang the most recent support for your proposition that we can send it back and get the grant, or is it the best support for that proposition? I think it's the most recent. In our brief, we cite two cases from other circuits, but Kang is the most recent and most persuasive. Thank you. Okay. So, just several points, Your Honor. I would underscore that the government still hasn't answered the principal question here, which is how Mr. Samadov is a danger to the United States. And Judge Slover, you brought up the example of the Nazis and asked what a more recent example would be. And one would be, under the government's theory, the current Nobel laureate would not be entitled to withholding in the United States simply because the Chinese government considers him to be a threat to that country. And that cannot be the law. And Judge Stapleton, you asked a series of questions asking whether or not there's any evidence about conduct, membership, or support. And I think that's an important question because I think we've read every immigration national security case in the Federal Reporter, and not one has concluded that someone is a danger to national security without finding one of those three things. Absent one of those three things, I think we'd have a serious constitutional question. And certainly, that would undermine our obligations under the Refugee Convention and leave us as an outlier among sister nations. The government says all that they have to demonstrate is a non-trivial risk of danger. That's not correct. The part of the Yusupov opinion in which the term non-trivial is used goes to the level of seriousness of the danger. They must...